[No. B200319, B200756. Second Dist., Div. Seven. Feb. 14, 2008.]

In re MIRACLE M. et al., Persons Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY
SERVICES, Plaintiff and Respondent, v.
JULIE G., Defendant and Appellant.

**COUNSEL**

Leslie A. Barry, under appointment by the Court of Appeal, for Defendant and Appellant.

Raymond G. Fortner, Jr., County Counsel, James M. Owens, Assistant County Counsel, and Frank J. DaVanzo, Principal Deputy County Counsel, for Plaintiff and Respondent.

OPINION

**WOODS, Acting P. J.—**

### *INTRODUCTION*

Appellant, Julie G., is the mother of two minor children, namely, Miracle M., born in 2003 and Faith M., born in 2005. Julie G. will hereafter be referred to as Mother in this opinion. The father of the children, Odele M., is not a party in this appeal, but will be referred to hereafter as Father as necessity dictates in the interest of presenting a full and accurate statement of the facts. Mother claims that errors were committed by the trial court in ordering the termination of parental rights. Mother's claim of errors centers on the alleged failure of the Department of Children and Family Services (DCFS) to give proper notices pursuant to the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.), hereafter referred to as ICWA. For the reasons hereafter given, the order terminating parental rights over Miracle M. is affirmed, but the order pertaining to Faith M. is reversed and remanded for further proceedings in accordance with the views expressed in this opinion.

### *FACTUAL AND PROCEDURAL SYNOPSIS*

*Detention background.*

On March 3, 2006, DCFS received a report that contained allegations of child abuse occasioned by Mother's use of methamphetamine and marijuana. The report also contained allegations that Father was using alcohol, marijuana and cocaine. Several years before the current report, Mother had been shot in the head and suffered from mental problems as a result. The children were being supported by other family members because Mother had failed to support the children with her income.

The DCFS social worker called Daniel Freeman Hospital on March 3, 2006, to talk with a paternal aunt, Anita M., and nurse Emma De La Cruz. The nurse reported that Faith M. had been born prematurely after 26 weeks of gestation, was delayed, had a shunt, and a history of seizures. The nurse further reported that the parents did not appear to be the primary caregivers for Faith M.

The DCFS social worker called Mother and was confronted with what the social worker described as explosive anger from Mother. During the conversation Mother purportedly told the social worker, "You will not get what you want!" Mother would not give the social worker permission to see Faith M. but the social worker indicated she was going to see the minor at the hospital. Mother then indicated that she would see the social worker at the hospital.

Nurse De La Cruz gave the following history about Faith M. from hospital records: admission was necessary because of breathing problems; she had been born at 26 weeks' gestation; weighed two pounds one ounce; was in the hospital for three and one-half months; was incubated for two months; had hydroencephaly; had a shunt placed in her head; had seizures while in the hospital; and was medicated with phenobarbital to control the seizures.

The social worker had an opportunity to observe Mother and Father and reported they appeared to be delayed. Father merely sat in the hospital room and did nothing, while Mother was volatile and blamed everyone else for the problems Faith M. was having.

When the social worker placed a call to Anita M., the paternal aunt, she related the following: Faith M. and the parents lived in her home; Father drank beer until he became incoherent; Mother told Anita M. she never had any money for the children because she periodically spent $20 on methamphetamine; and she was of the opinion that Mother had been using drugs for years.

Anita M. further related to the social worker that she was the primary caregiver for Faith M. based on the fact that she never left the minor alone with Mother and Father; and that she and Murline M., another paternal aunt, cared for the older child, Miracle M.

When the social worker met with Mother and Father in the hospital room of Faith M., she reported seeing and hearing the following: Mother stormed out of the room; Father and a nurse were able to bring Mother back where they met in a separate room; Mother was highly agitated; Mother stated she had taken eight packets of aspirin that day to relieve her headaches; Mother stated that because she was shot at age 10, bullets were still in her brain which caused her to become angry; Mother would not take prescribed medications for relief of anger; Mother refused drug tests; Mother needed no assistance in caring for her children; Mother refused any assistance in caring for her children; Father encouraged Mother to listen to the social worker;

Father stated he does drink but denied using drugs; Mother asserted she does not use drugs, but Father encouraged her to tell the truth about her past; Mother claimed she had not used drugs since 2000; Father stated Mother often became angry but he would not allow her to be alone with the children; Mother admitted that she now lived with Anita M., but had plans to move to San Bernardino County and take the children with her; Mother refused to tell the social worker where she might live; Mother revealed she had an adult child, Monica G., who had previously been removed from her care nine years ago for reasons of child abuse; Mother had hidden the location of Monica from the dependency court for eight months; and eventually the court closed the case.

The social worker and her supervisor made the determination to detain Faith M. on the basis Mother constituted a flight risk. Accordingly, the hospital placed a hold on Faith M.

The social worker next spoke with paternal aunt, Murline M., who related the following: She wanted Miracle M. placed with her; stated concerns about the ability of the parents to care for the child; the parents were not the primary caregivers; Father was an alcoholic and Mother quite often smelled of marijuana; and stated she resided with her 19-year-old daughter, Ronnaya. Upon evaluation of the home of Murline M., the social worker found: a clean home; a well-organized home; plenty of food; appropriate toys; and adequate clothing for Miracle M. Based upon this evaluation, the social worker placed Miracle M. with Murline M.

The social worker confirmed that the most recent child abuse referral dated, October 17, 2005, had been substantiated, but the children had been allowed to remain in Mother's home because an adult sibling, Monica G., made an appearance of being able to care for the children.

A report by the information court officer indicated that Faith M. had been discharged from the hospital and placed with paternal aunt, Murline M.

*Initial hearing on March 8, 2006.*

At the initial hearing on March 8, 2006, the following occurred: the court deemed Father to be the presumed father of both children; Mother indicated she had American Indian heritage, indicating she did not know what tribe she

was from, but did state that she was "mixed with Indian"; a paternal aunt also told the court that Father had American Indian ancestry, but had no knowledge of the tribe; and the court ordered DCFS to send notice to the Bureau of Indian Affairs (BIA).

*Social worker's report of April 6, 2006, pertaining to ICWA notice compliance.*

A summary of the social worker's report dated April 6, 2006, is as follows: the social worker contacted paternal aunt, Anita M.; Father could not be reached so inquiry was made about his claimed Indian heritage from the paternal aunt; Anita M. told the social worker the maternal great-grandmother, Carrie Lee B., had been a Cherokee Indian, but it was unknown if she was registered by the tribe; notice was mailed by the social worker via certified mail to three Cherokee Indian tribes, BIA and Office of the Interior; maternal grandmother related that Mother's family had no American Indian heritage, but was descended from Mexican Indians, the Mayans; and the social worker concluded ICWA had no application to the maternal side of the family. Attached to the report was former JV-135, the Judicial Council form for Notice of Involuntary Child Custody Proceedings for an Indian Child; the notice was filled out regarding Miracle M., but not for Faith M., containing the names, birth dates, address of Mother and Father, names and birth dates of both maternal and paternal grandmothers, the name and birth date of the paternal grandfather and the name and birth date of the paternal great-grandmother.

The certificate of mailing revealed it was signed by the DCFS social worker; indicated the notice and a copy of the petition had been mailed, certified mail return receipt requested, to all three Cherokee tribes, the Secretary of the Interior, Washington, D.C., and the BIA in its regional office in Sacramento, California. There was no indication on the JV-135 form that it had been mailed to Mother and Father. Instead, the social worker mailed a "notice of hearing on petition" to Mother and Father.

*Social worker's interview with Mother on March 29, 2006.*

The following occurred on March 29, 2006, when the social worker undertook an interview with Mother: Mother yelled at the social worker over the telephone; Mother denied any current drug use; Father indicated he had met Mother about four years prior; at that time Mother had been smoking

methamphetamine and marijuana; Mother and Father had also "done" cocaine together; Father stated Mother last used marijuana and methamphetamine about four to five months ago; Mother never complied with a treatment program; Father admitted to a 20-year history of using marijuana, cocaine and alcohol; and Father had last used cocaine about one and one-half months ago.

*Social worker's interview with adult sibling, Monica G.*

The social worker then conferred with the adult sibling, Monica G., who provided the following information: Mother had used drugs for a long time, and still used marijuana; Mother still had bullets in her head, in the opinion of Monica G., and Mother's use of marijuana was to deal with her pain; Mother had moved next door to Monica G. and she believed that Mother had not used drugs for the past month; Monica G. stated that she had been detained from Mother's custody when she was seven years old because she was being sexually abused by Mother's boyfriend; Mother and her boyfriend had been using drugs at the time; Mother did a drug program but never had Monica G. returned to her; at age 14, Monica G. ran away from her placement and stayed with friends and her boyfriend; and she stated, "I was living on my own not with my mom."

*Child safety conference with maternal grandmother and Monica G.*

The social worker then conducted a child safety conference with the maternal grandmother and Monica G. in attendance; Mother, Father and Murline M. did not attend. The following occurred: both attendees stated Mother was mentally and emotionally disturbed; Mother had anger management and mental health issues; because Mother refused services she had never been diagnosed; Mother's mental health had deteriorated because she had a greater propensity for violence; Mother never disciplined the children, but just yelled at them; neither attendee thought Mother would hurt the children; Monica G. could not take care of the children because she had two children of her own and was pregnant with twins.

*Hearing on April 6, 2006.*

At the April 6, 2006, hearing, the following occurred: Mother was present with counsel; Mother entered a waiver to an amended petition alleging Mother had a history of drug use which periodically rendered her incapable

of caring for the children; the matter was continued by the trial court to allow receipt of the "green return receipt cards" from the Cherokee tribes and for the disposition hearing; neither Mother nor her counsel objected that Mother or Father had not been sent a copy of the JV-135 notice.

*Hearing on May 12, 2006.*

The hearing on May 12, 2006, dealt primarily with the issue of notice to the Indian tribes. The following occurred: the social worker's report included attached green return receipts indicating that notices had been received by the Cherokee Nation of Oklahoma on April 3, 2006, the United Keetoowah Band of Cherokee Indians on April 7, 2006, and the Eastern Band of Cherokee Indians on April 4, 2006; also attached to the report was a letter from the Cherokee Nation stating Miracle M. was not an Indian child, a letter from the United Keetoowah Band of Cherokee Indians in Oklahoma stating that Miracle M. was not eligible for enrollment in the United Keetoowah Band. Responses from all three Cherokee tribes were attached to a June 14, 2006, report. The Eastern Band of Cherokee Indians indicated Miracle M. was not an Indian child.

*Trial court's ruling on May 12, 2006.*

Court-appointed Attorney Takin Khorram "stood in" for both Mother and Father at the hearing on May 12, 2006, as neither counsel for Mother nor Father were present. Mother and Father were not present. The following occurred: the court noted that it had received the green return receipt cards showing that DCFS had mailed notices to the tribes; the court had received letters from the Indian tribes; the court ruled this was "NOT AN ICWA ELIGIBLE CASE"; no objection was made to this finding; and no objection was made by Mother or Father that they had not been mailed the JV-135 notices.

The court indicated that it took notice of an "ethical walls" letter filed by Takin Khorram revealing that he has been hired as a deputy in the Office of the Los Angeles County Counsel. This court notes that none of the parties to this appeal have raised any issue pertaining to the representation provided in the trial court by Takin Khorram.

*Hearing on June 14, 2006.*

The following occurred at the hearing on June 14, 2006: Mother was present with counsel; the social worker reported that Mother and Father were

living at the same address in San Bernardino; Mother reported Father had started living with her in March of 2006 in a home located next to the home of Monica G.; Father, however, left Mother's home on May 3, 2006, and had not returned; paternal aunt, Murline M., related she had spotted Father near her home on May 5, 2006; and at that time Father appeared to be under the influence of drugs. The court continued the matter to July 12, 2006, for the purpose of finding archived files on Mother's old dependency proceedings to determine whether there was any basis to deny Mother reunification services; the court mentioned that additional letters from the Cherokee tribes had been received, and were supported by green return receipt cards; Mother made no objection that neither she nor Father had received a copy of the ICWA notices; and the court mentioned that a due diligence search was pending in an effort to locate Father.

*Hearing on July 12, 2006.*

Mother was not able to come to court on July 12, 2006, and as a result the court continued the contested disposition hearing to August 23, 2006, but the following occurred at the hearing: the social worker's report stated Mother had not enrolled or participated in any programs; Father had left Mother's residence in San Bernardino and had requested his mail be forwarded to Anita M.'s address; Murline M. had talked to Father who told her that he was living in a downtown mission; attached to the social worker's report was a toxicology laboratory test result showing Mother tested positive for cannabinoids on June 12, 2006; and Mother was a no-show for the June 27, 2006, testing.

*Hearing on August 23, 2006.*

Mother was present and the following occurred: Mother was granted reunification services in view of the fact that a 1997 minute order stated Monica G.'s case had been terminated with Monica G. being placed in Mother's home; Father's whereabouts were unknown so the court did not order reunification services for Father; the trial court and Mother both signed a case plan wherein Mother would complete a drug rehabilitation program with random testing, parent education and individual counseling to address case issues; both children were placed with their paternal aunt; Mother's visits were to be monitored; and DCFS was given discretion to liberalize visits.

*October 12, 2006, six months review hearing.*

Mother was not present. Mother appeared by her counsel who was present. The following took place at the hearing: the social worker's six-month-review

report stated Mother was not in compliance with the court's orders in that Mother continued to test positive for marijuana; Mother had not enrolled in any of her court-ordered programs; Mother had not arranged for any visitation; Mother had not called Murline M., the paternal aunt and caregiver, to talk with Miracle M. or Faith M.; Mother's only visit occurred when the girls were brought to the home of their adult half sibling, Monica G., for a visit; Mother lived next door to Monica G. so it would have been easy for Mother to visit the children; Murline M. stated she would be willing to monitor Mother's visits in her home; Mother had not taken steps to visit the children at this location; the social worker had given referrals to Mother on April 5, 2006, August 29, 2006, and September 15, 2006, and Mother signed and acknowledged receipt for the referral notifications; Mother had either tested positive for cannabinoids or had been a "no-show" for testing; paternal aunt, Murline M., stated she wished to adopt the children; the children had resided with her since March 7, 2006; and the social worker recommended that reunification services be terminated for Mother; the court denied a motion by Mother's counsel to continue the current matter and set the case for a contested Welfare and Institutions Code section 366.21, subdivision (e) hearing on November 2, 2006.

*Contested hearing on November 2, 2006.*

Mother and her counsel were present at the contested hearing. The following occurred: counsel for Mother indicated to the court that Mother did not wish to testify; Mother would proceed by way of written argument; Mother's counsel related to the court that she was due to begin her programs on November 15, 2006; Mother had been on a waiting list and had not been able to start her programs; Mother had not been using marijuana; Mother did not know how the positive test happened; and Mother requested six more months of services.

The court terminated reunification services for Mother. The court set March 7, 2007, as the date set for a Welfare and Institutions Code section 366.26 hearing.

*Welfare and Institutions Code section 366.26 hearing on March 7, 2007.*

For the Welfare and Institutions Code section 366.26 hearing on March 7, 2007, the social worker's report is summarized as follows: one-and-one-half-year-old Faith M. had been diagnosed with a mild developmental delay; she was receiving Regional Center services; she was able to hold her head up, walk and sit with assistance; she was starting to feed herself and drink out of a cup; Murline M., her caretaker, stated she had begun to talk and was able to

say the names of people and say such words as "hi," "bye," "dog," "pamper," and "mommy"; she suffered from microencephaly and had "VP shun[t] hydrocephalus second to IVH"; and her doctor stated that she needed physical and occupational therapy.

The social worker's report pertaining to three-and-one-half-year-old Miracle M. was as follows: she was meeting her developmental milestones; she walked with good balance, used a cup and spoon and fed herself; she was almost fully toilet trained; she was starting to dress herself, do her own hair, learning her ABC's and to tie her shoes.

The social worker reported the following about Murline M., caretaker of the minors: both children had been living with her for one year; she had also cared for Miracle M. for weeks at a time, ever since Miracle M. was just a few days old; she wanted to provide the girls with a permanent home; she was able to care for the girls with her salary and the money she received for their care; she wanted to adopt the girls; Mother only wanted to visit the girls at her daughter's apartment which was next door to her own apartment; Mother refused to maintain telephone contact with the minors or remain in contact with Murline M. The social worker concluded by recommending that Mother's parental rights be terminated.

On March 7, 2007, the matter was continued by the trial court for a contested hearing by Mother.

*Hearing on May 3, 2007.*

The social worker's report for the May 3, 2007, hearing is summarized as follows: the children continued to thrive in the home of Murline M.; the social worker visited the home of Murline M. and observed Miracle M. putting a toy together and proudly stating "I did it," as she succeeded in doing so; Faith M. was able to pull herself up and walk, as well as to feed herself; she was talking more; she was wearing glasses which seemed to eliminate her cross-eyed condition; Mother told the social worker on April 20, 2007, that she had been giving her grandson a bath when something told her to hurt the boy; but Mother went to another room, looked in the mirror and yelled that she was not going to hurt her grandson; the grandson asked who she was talking to, and Mother told him that she was not talking to anyone and that she was not going to hurt him; Mother related to the social worker she had taken herself off of medication, had been talking to herself and had been having nightmares; the social worker called Mother's program manager at the drug rehabilitation center Mother was attending; the program manager stated Mother had been going to the program, but she was not compliant in meeting her case goals; the manager felt that a residential program would more likely meet Mother's mental health needs.

Murline M. reported as follows: Mother visited the children on February 14, 2007; she said she was testing clean, but was still smoking "blunts" (a commonly known procedure which involves hollowing a cigar and filling it with marijuana); during the visit Mother threatened to spank Miracle M. or put her in the closet unless she shared the toy that Mother had brought for the girls; and this was Mother's only visit with the girls.

The court was presented with a last-minute information report indicating the home study would be completed by May 31, 2007; yet to be completed were criminal and child abuse clearances for two people who frequented the home of Murline M.; and medical reports, as well, needed to be completed on the two minors.

The trial court continued the matter to June 14, 2007, for the contested hearing.

*Contested hearing on June 14, 2007.*

A summary of events on June 14, 2007, is as follows: Mother was not present for the hearing and her counsel requested a continuance of the matter; the request was denied by the court; parental rights were terminated, the court having found by clear and convincing evidence the minors were likely to be adopted and that the minors were adoptable; the court continued the matter to July 13, 2007, for the purpose of determining whether counsel for Father had given Father notice of the hearing.

*July 13, 2007, hearing.*

On July 13, 2007, the court found and ruled as follows: notice had been given to Father; the stay of the court's order on June 14, 2007, was lifted; and the court ordered termination of parental rights over the children.

Mother filed her first notice of appeal from the termination of parental rights on June 14, 2007. Mother filed a second notice of appeal on July 23, 2007, appealing the trial court's order terminating parental rights on June 14, 2007, and the order lifting the stay of the order entered on July 13, 2007.

## DISCUSSION

In capsule form, Mother's two appeals, consolidated for all purposes as ordered by this court, raises issues under the Indian Child Welfare Act, ICWA

as previously designated. In the introduction section of her opening brief on appeal, Mother claims that "From the out set of this case, both the Los Angeles County Department of Children and Family Services (DCFS) and the juvenile court were aware that Father claimed American Indian ancestry. DCFS' investigation revealed that ancestry was through a Cherokee tribe. Therefore, DCFS provided notice pursuant to the Indian Child Welfare Act (ICWA) as ordered by the juvenile court. However, the notices sent did not comply with the mandates of the ICWA because notice was provided regarding only one of the two children and the parents were not provided copies. Therefore, the juvenile court's finding that the ICWA did not apply and the subsequent orders terminating parental rights must be reversed."

### DCFS's concession in reference to Faith M.

DCFS does not oppose reversal of the order terminating parental rights as to Faith M. and remanding the matter to the juvenile court for the sole purpose of providing notice to the Cherokee Nation of Oklahoma, the United Keetoowah Band of Cherokee Indians, the Eastern Band of Cherokee Indians, and the BIA. But DCFS takes the position on appeal that the reversal should be a limited reversal in accordance with Code of Civil Procedure section 43.

### DCFS's position pertaining to Mother's alleged entitlement to notice in the Miracle M. appeal.

Our attention is invited to the fact that Mother's notices of appeal were from orders terminating her parental rights and the subsequent order lifting the stay on this order. DCFS correctly points out Mother did not file a timely appeal from the finding on May 12, 2006, in which the court made a determination that ICWA did not apply in this case. DCFS correctly notes that Mother cannot appeal from an order or finding that is not even mentioned in her notice of appeal, citing California Rules of Court, rule 8.100(a)(2) as authority and *Calhoun v. Vallejo City Unified School Dist.* (1993) 20 Cal.App.4th 39, 41–42 [24 Cal.Rptr.2d 337] (the notice of appeal must include the order appealed from).

█ DCFS accuses Mother of relying on the general rule that "[w]here there is reason to believe a dependent child may be an Indian child, defective ICWA notice is 'usually prejudicial' " as stated in *In re Nikki R.* (2003) 106 Cal.App.4th 844, 850 [131 Cal.Rptr.2d 256] (failure to comply with ICWA notice is not waived by the parent's failure to first raise it in the trial court).

This court agrees, however, that this rationale does not apply once the tribes have appeared and not asked that any prior actions of the juvenile court be invalidated. In *In re S.B.* (2005) 130 Cal.App.4th 1148, 1160 [30 Cal.Rptr.3d 726], wherein a mother sought to set aside all prior court orders before the Indian tribes appeared in court, the appellate court stated, "While the social worker and the trial court have a duty to inquire into the child's Indian ancestry, a parent has superior access to this information. Moreover, a parent has a right to counsel, including appointed counsel, if necessary [citation], who has not only the ability but also the duty to protect the parent's rights under the ICWA. As the trial court in this case observed, if a parent has Indian ancestry, 'I would think as officers [of] the court, counsel for parents would have [a] similar interest [in] bring[ing] that information forward at the earliest possible time.' "

The conclusion which DCFS asks this court to reach is that the parents in this instance failed to object that they were not served with copies of the JV-135 form which was made a part of the court file and made available to them at each hearing and, having failed to do so, they have not preserved the matter for appellate review and the issue is thereby waived on appeal. We so conclude.

■ This court further reasons that even if there was a defective notice to the parents, the error was harmless. Here the juvenile court made an ICWA inquiry from the outset of the proceedings. Just as the *S.B.* court reasoned in determining that the juvenile court may have failed to follow the ICWA, the violation may nevertheless be harmless, particularly where the tribe actually participated in the proceedings. Here, Mother has not demonstrated how giving the parents further notice would generate additional information. Father had appointed counsel, and became "whereabouts unknown" soon after his appearance in this matter. And Mother, having filed this appeal, does not tell us how reversing the court's orders as to Miracle M. would produce any additional information that this child is an Indian child. (*In re Rebecca R.* (2006) 143 Cal.App.4th 1426, 1431 [49 Cal.Rptr.3d 951].) The error here is harmless.

In this instance Mother had her opportunity to prove that the children were not adoptable, as well as to prove that termination of parental rights would be detrimental to them, but Mother chose not to pursue either argument in her appeal.

## *DISPOSITION*

The orders pertaining to Miracle M. are affirmed. The orders pertaining to Faith M. are reversed and remanded to the trial court for compliance with ICWA by giving notice to the Cherokee Nation of Oklahoma, the United Keetoowah Band of Cherokee Indians, the Eastern Band of Cherokee Indians, and the Bureau of Indian Affairs. After giving notice as required by ICWA and if no tribe determines that Faith M. has any Indian heritage, the orders of the trial court shall be reinstated as affirmed by this court.

Zelon, J., and Wiley, J.,* concurred.

---

*Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to artcle VI, section 6 of the California Constitution.